# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### November 15, 2011 Session

## CHRISTIE QUINN-GLOVER v. THE REGIONAL MEDICAL CENTER AT MEMPHIS

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-002803-10      James F. Russell, Judge**

---

**No. W2011-00100-COA-R3-CV - Filed January 17, 2012**

---

Plaintiff filed a retaliatory discharge claim against her employer pursuant to Tennessee Code Annotated section 50-1-304 and the Tennessee common law. The employer filed a motion to dismiss, alleging that Plaintiff's complaint failed to state a claim upon which relief could be granted. The trial court granted the employer's motion without granting Plaintiff's requests to amend her complaint. From the record, it is unclear whether the trial court considered Plaintiff's requests, and if it did, the reasons for its denial of such are not apparent. Accordingly, we vacate the trial court's dismissal of Plaintiff's complaint and we remand for consideration of her requests to amend and for express findings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Vacated and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

James E. King, Jr., P. Craig Grinstead, Memphis, Tennessee, for the appellant, Christie Quinn-Glover

Jonathan Hancock, Joann Coston-Holloway, Memphis, Tennessee, for the appellee, The Regional Medical Center at Memphis

# OPINION

## I.  FACTS & PROCEDURAL HISTORY

Christie Quinn-Glover ("Plaintiff"), a former triage registered nurse at The Regional Medical Center at Memphis (the "Med"), filed suit against the Med, alleging retaliatory discharge in violation of Tennessee common law and the Tennessee Public Protection Act ("TPPA"), also known as the "Whistleblower Statute," which "prohibits the discharge or termination of any employee for refusing to participate in or refusing to remain silent about illegal activities." *Harman v. University of Tennessee*, --- S.W.3d ---- , 2011 WL 4336602, at *1 (Tenn. Sept. 16, 2011) (citing Tenn. Code Ann. Section 50-1-304(1)(b) (Supp. 2010)). The Med filed a motion to dismiss, pursuant to Tennessee Rule of Civil Procedure 12.02(6), claiming that Plaintiff had failed to establish a claim upon which relief could be granted. Regarding her common law claim, the Med argued that Plaintiff failed to allege both an important public policy interest that had been furthered by her report of "illegal activity" and a causal connection between her reports and her termination. Regarding the TPPA, the Med argued that her complaint failed to allege facts sufficient to establish her refusal to remain silent about "illegal activities" and that it failed to allege that retaliation was the sole motivation behind her termination.

The trial court granted the Med's motion to dismiss, finding that Plaintiff's complaint contained "bare bone and conclusory allegations" with "no allegations of specific illegal activities . . . nor . . . any pleadings of violation of any criminal statute or any established rule or regulation of any government or any agency" to support her statutory and common law retaliation claims. Plaintiff appeals.

## II.  ISSUES PRESENTED

Plaintiff presents the following issues for review, as summarized:

1.   Whether Plaintiff's complaint stated a claim for relief; and

2.   Whether the trial court erred by dismissing Plaintiff's complaint without granting her leave to amend.

For the following reasons, we vacate the trial court's dismissal of Plaintiff's complaint and we remand for consideration of her requests to amend and for express findings.

## III. STANDARD OF REVIEW

"A Rule 12.02(6) motion to dismiss seeks only to determine whether the pleadings state a claim upon which relief can be granted." **Edwards v. Allen**, 216 S.W.3d 278, 284 (Tenn. 2007). The motion challenges the legal sufficiency of the complaint, admitting the truth of all relevant and material averments contained therein, but asserting that such facts do not constitute a cause of action. **Id.** "It is well-settled that a complaint should not be dismissed for failure to state a claim unless it appears that the plaintiff can prove no set of facts in support of his or her claim that would warrant relief." **Trau–Med of Am., Inc. v. Allstate Ins. Co.,** 71 S.W.3d 691, 696 (Tenn. 2002). We are required to take the relevant and material factual allegations in the complaint as true and to liberally construe all allegations in favor of the plaintiff. **Edwards,** 216 S.W.3d at 284. We are not, however, "required to accept as true assertions that are merely legal arguments or 'legal conclusions' couched as facts." **Webb v. Nashville Area Habitat for Humanity, Inc.**, 346 S.W.3d 422, 427 (Tenn. 2011) (citing *Riggs v. Burson*, 941 S.W.2d 44, 47 (Tenn. 1997)). We review a trial court's conclusions of law, including its ruling on a 12.02(6) motion to dismiss, *de novo* with no presumption of correctness. **Edwards**, 216 S.W.3d at 284; **see also Doe v. Catholic Bishop for Diocese of Memphis**, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008) (citing *Stein v. Davidson Hotel Co.,* 945 S.W.2d 714, 716 (Tenn.1997); *Farris v. Todd,* No. E1999-01574-COA-R3-CV, 2000 WL 528408, at *2 (Tenn. Ct. App. May 3, 2000)).

## IV. DISCUSSION

### A. Plaintiff's Complaint

The sufficiency of Plaintiff's complaint is at issue on appeal. Therefore, we begin our analysis by reviewing her complaint, taking the following relevant "factual allegations" as true:

> The Plaintiff originally began working for the Defendant in May 1999 . . . . The Plaintiff was [eventually] hired as the Defendant's Triage Nurse for all of Defendant's emergency room services including but not limited to the Elvis Presley Trauma Center ("The Trauma Center").

> In the position of Triage Nurse, Plaintiff's duties included but were not limited to expediting patient care by prompt, accurate assessment which prioritizes patients into tiers, resulting in appropriate response level for medical evaluation and treatment. Plaintiff was charged with the duty of

assessing the physical and psychological needs of patients presenting to triage; prioritizing patients based on their chief complaint, history, and physical assessment; provide information, answer any questions and provided reassurance to the patient; and facilitate the immediate transport of patients to the appropriate treatment area when beds are open and available.

There are certain policies and procedures commonly known by individuals working within hospital Trauma Centers and ERs such as the Defendant's facility, as to how to categorize patients based upon their injury and complaints in accordance with the Emergency Severity Index for appropriate and timely care and placement of waiting patients. Primarily, patients assessed with or complaining of emergent or life threatening injuries that required immediate treatment must be brought back to triage immediately to begin medical treatment. Alternatively, [p]atients classified with urgent but stable conditions may remain in the waiting room but must be reassessed every four (4) hours.

To [e]nsure that each waiting patient received proper, timely and appropriate treatment, Plaintiff always assessed the patient's injury to make determinations as to where waiting patient[s] should be directed for proper care. Specifically, Plaintiff had to determine whether the waiting patient's injury was of such a severe and emergent nature to be determined to the Trauma Unit for immediate medical treatment or to the ER for treatment.

Once Plaintiff assessed the waiting patient for proper treatment, Plaintiff['s] duties required her to contact the Trauma Center staff to get an estimated wait time for placement of waiting patients. The Trauma Center staff are charged with placing waiting patients in treatment rooms once they became available and monitoring the patient until the patient can be seen by the Trauma Center physician.

Plaintiff was one of only two black nurses that triage patients for the Trauma Center. Nearly all patients that are admitted through the Trauma Center and ER are African-American patients. However, all of Defendant's Trauma Center staff charged with placement of waiting patients are Caucasian.

During Plaintiff's last several years of employment at Defendant's

Trauma Center facility, Plaintiff began to notice the lack of immediate treatment for patients with emergent, life threatening injuries and/or immediate neglect of other patients waiting despite the availability of medical staff and treatment rooms/beds. Plaintiff also observed the Trauma Center nursing staff selectively place Caucasian patients waiting in the ER before waiting African-American patients who had been waiting much longer and in some cases with more severe or emergent injuries than the Caucasian patients.

In or about November 2009, Plaintiff reported to Department Head, Pam Castleman (Ms. Castleman) and Nursing Supervisor Jackie Smart (Ms. Smart) issues of unsafe patient treatment in which patients had a triage category assigned and the Trauma Center nursing staff changed the category to account for extended wait times. The Trauma Center nursing staff changed these categories to justify long wait times for patients not using ambulance transport despite being notified by Plaintiff of the severity of illness. Plaintiff also reported to Ms. Castleman the unnecessary long wait times for African-American patients despite available Trauma Center beds and Trauma Center nursing staff selectively choosing certain (Caucasian) patients ahead of other African-American patients with more severe injuries. Ms. Castleman assured Plaintiff she would "take care of it." However, Plaintiff observed that the illegal practice continued.

Following[] the November[] 2009 report to Ms. Castleman and through the months leading up to her March 2010 termination, Plaintiff was met with more resistance and lack of cooperation from the Trauma Center nursing staff. Now when Plaintiff attempted to get wait times, the Trauma Center nursing staff would ignore Plaintiff and/or be even less responsive to Plaintiff's inquiries. Additionally, Ms. Castleman began to avoid Plaintiff altogether or not even speak to Plaintiff. On another occasion, Plaintiff pointed out the lack of medical documentation of a Caucasian patient taken ahead of African American patients and Ms. Castl[e]man downplayed the incident and attempted to come up with unfounded excuses as to why there was no documentation.

In January 2010, The Trauma Center staff continued their retaliatory treatment of Plaintiff when she attempted to visit a family friend who had just been shot and was admitted to the Trauma Center for treatment. When Plaintiff attempted to visit the family friend along with other members of his

family, the Trauma Center staff refused to allow Plaintiff and the other members entrance. Conversely[,] prior to filing the November 2009 report, Plaintiff's husband was shot and admitted to the Trauma Center for treatment and the same Trauma Center staff allowed Plaintiff entrance without issue.

On or about March 1, 2010, Plaintiff was needed to work an extended shift past her normal 7:00 A.M. to 7:00 P.M. shift as the Triage nurse. Plaintiff had triaged several patients who had already exceeded four to seven or more hours in wait times to be seen in the Trauma Center. In fact Plaintiff triaged two waiting patients "red" for emergent and immediate care during the beginning of her shift, yet those two patients still had not been seen by the time Plaintiff clocked out at about 10:00 P.M. Plaintiff followed triage guidelines and protocol of checking wait times, reporting same to patients every four hours before vitals were reassessed and informing the Trauma Center nursing and medical staff of patients waiting, and acuity levels. Several patients became upset due to the extremely long wait times and the family members of other waiting patients became upset because those patients were not being see[n] despite having severe injuries. Some patients contacted the trauma nurse via a phone outside the trauma center door and three patients returned to the triage complaining about the rudeness of the charge nurse answering the phone and her failure to provide information regarding wait times and treatment.

That same night a hysterical and upset mother approached Plaintiff inquiring about the status of her 17 year old son. The Mother stated that she was contacted by the Trauma Center and told her son needed emergency surgery. Mother state[d] the Trauma Center nurses would not give her any information on the status of her child. Plaintiff and Ms. Tate accompanied Mother to the trauma center nursing station seeking status of Mother's son as well as other patient wait times.

Once at the Trauma nursing station, nurse Evette asked Plaintiff if she was the one sending the patients down the hall and giving them the station number. Nurse Evette commented that "if they can walk down the hall and call from the hall they must not be too bad." . . . . Eventually nurse Evette stated that they were busy and could not put a time on how much longer the wait would be.

-6-

At approximately 10:00 [P.M.], Plaintiff clocked out and checked the waiting room for her sister whom she had triaged over two hours earlier. Plaintiff's sister . . . was not in the triage area and Plaintiff inquired about [her sister] at the trauma nurse station. Nurse Evette stated she was calling security to which Plaintiff left the area.

Prior to leaving the hospital, Plaintiff reported the illegal activity of the intentional failure of the trauma nursing staff to provide appropriate, adequate, or timely medical treatment of waiting patients to the nursing supervisor, Stephanie, the medicine emergency room assistant nursing supervisor, Becky Brooks[,] and the physician in charge of medicine emergency room, Dr. Shelly Surbrook. Also present were Dr. Pierce and other resident physicians.

While reporting the illegal activity to Dr. Surbrook and Nurse Brooks, Med security approached stating "Liz (trauma nurse manager) instructed us to remove you from the property." However, Nurse Becky advised Security she was in charge and continued to take the report from Plaintiff. Nursing Supervisor Stephanie advised Plaintiff to contact the Compliance Line to report the aforementioned incidents of that night.

Upon arriving home, Plaintiff contacted the compliance line to report the illegal activity of the intentional failure of the trauma nursing staff to provide appropriate, adequate, or timely medical treatment of waiting patients. Plaintiff gave her name and position but was told that her identity would be kept confidential by the Med[']s legal department.

On March 2, 2010, Plaintiff was on her scheduled day off when Carolyn Ester of the Defendant's Risk Management Department called [P]laintiff to request a meeting to provide information regarding the compliance call. Plaintiff reported to Ms. Ester as requested and provided details of the events forming the bases of the report to the compliance line including previous reports to Pam Castleman regarding unsafe treatment of patients after triage category assigned[,] trauma nursing staff changing category to account for extended wait times, and long wait times for patients not using ambulance transport despite being notified by triage nurse of severity of illness.

On March 3, 2010, suddenly and without warning, Plaintiff was given

a written notice of corrective action signed by Pam Castleman for call-in [absences] dated 9/01/09, 9/26/09, 10/26/09, 11/02/09, 1/04/10, and 1/30/10 which resulted in four attendance occurrences. All of the aforementioned call-in dates were excused due to medical reasons for which Plaintiff provided medical documentation prior to Plaintiff's report of illegal activity.

On March 5, 2010, Plaintiff was nearing the end of her shift when she was summoned to the office of Pam Castleman . . . . Present also was Gwen Reese, Director of Med Surgical. During this meeting, Ms. Castleman informed Plaintiff that she would be suspended pending the investigation by the legal department for the compliance call Plaintiff made on March 1, 2010, adding that "those were pretty big allegations you made against Trauma and I've decided to suspend you pending the investigation." Ms. Castleman further commented that she was aware that Plaintiff met with Carolyn Ester in the legal department on Plaintiff's off day and she [Ms. Ester] heard Plaintiff's side of the story.

On March 9, 2010, Plaintiff sought assistance from the Defendant's legal department. Ms. Ester informed Plaintiff that Ms. Castleman had inquired as to whether Plaintiff could be fired for taking pictures in the hospital and/or for triaging her own sister. Ms. Ester informed Plaintiff that it appeared Ms. Castleman was looking for a reason to terminate [P]laintiff.

On March 10, 2010, Plaintiff met with Human Resource Director Fred Boyd ("Mr. Boyd"), who stated he was new and the decision had been made by others. Mr. Boyd informed Plaintiff that she was being fired allegedly due to inappropriate conduct and gave Plaintiff a termination of Employment letter dated March 10, 2010. Said Termination letter asserts "**it was reported, witnessed and documented that Plaintiff demonstrated accusatory and confrontational behavior, used derogatory and profane language towards members of hospital staff regarding treatment of your sister**." Plaintiff submits that these assertions are pretext and without merit as she never exhibited accusatory or confrontational behavior nor did she use derogatory and profane language towards any member of the hospital staff.

On or about March 22, 2010, Plaintiff provided Ms. Ester a copy of the termination letter and Ms. Ester informed Plaintiff she was not aware of

Plaintiff's termination because there was still an ongoing investigation of the compliance conduct.

Plaintiff was terminated for reporting the illegal act of falsifying medical records, intentionally failing to provide timely, adequate and/or proper medical treatment to patients seeking treatment at Defendant's facility leading to risk and detriment of the health and welfare of the patients.

Following her recital of the "facts," Plaintiff recited her "Causes of Action" as follows:

The Tennessee State common law claim of whistle blower retaliation because the Defendant intentionally terminated Plaintiff's employment after Plaintiff reported the illegal act of intentionally failing to provide timely, adequate and/or proper medical attention to patients seeking medical treatment at Defendant's facility which was a substantial factor in the decision that caused Pam Castleman to abruptly terminate Plaintiff shortly thereafter.

The Tennessee Statutory claim pursuant to T.C.A. § 50-1-304 because Plaintiff refused to participate in/or remain silent about the illegal act of intentionally failing to provide timely, adequate and/or proper medical attention to patients seeking medical treatment at Defendant's facility which was a substantial factor in the decision that caused Pam Castleman to abruptly terminate Plaintiff shortly thereafter.

## B. Retaliatory Discharge

Tennessee has long adhered to the doctrine of employment-at-will, which recognizes the concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 534-35 (Tenn. 2002); *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997). However, by statute and case law, some restrictions have been imposed on the right of an employer to terminate an at-will employee. *Stein*, 945 S.W.2d at 716. Specifically, retaliatory discharge represents "an important, but narrow, exception to the employment-at-will doctrine[,]" which is available "'in limited circumstances, [where] certain well-defined, unambiguous principles of public policy confer upon employees implicit rights which must not be circumscribed or

chilled by the potential of termination.'" ***Franklin v. Swift Transp. Co., Inc.***, 210 S.W.3d 521, 530-31 (Tenn. Ct. App. 2006) (quoting *Stein*, 945 S.W.2d at 717). An action for retaliatory discharge is a limited exception to the employment-at-will doctrine, which "cannot be permitted to consume or eliminate the general rule." ***Chism v. Mid-South Milling Co., Inc.***, 762 S.W.2d 552, 556 (Tenn. 1988).

On appeal, Plaintiff asserts that her complaint sufficiently stated a claim for retaliatory discharge under both the Tennessee Public Protection Act, Tennessee Code Annotated section 50-1-304, and the common law. We consider these assertions in turn.

### 1. Tennessee Public Protection Act

To prevail under a statutory retaliatory discharge claim, a claimant must show:

> (1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to participate in or remain silent about illegal activity; (3) the defendant employer discharged or terminated the plaintiff's employment; and (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

***Webb***, 346 S.W.3d at 437 (*Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 27 (Tenn. 2011)). Here, the parties agree that Plaintiff was an employee of the Med, and that the Med terminated her employment. However, the parties dispute whether Plaintiff's complaint sufficiently alleged the reporting of "illegal activity" and whether Plaintiff's complaint alleged termination *solely* as a result of such reports.

A pleading asserting a claim for relief must contain: "(1) a short and plain statement of the claim showing that the pleader is entitled to relief; and (2) a demand for judgment for the relief the pleader seeks." **Tenn. R. Civ. P. 8.01**. "While the complaint need not contain detailed allegations of all the facts giving rise to the claim, it must show that the plaintiff is entitled to relief." ***Harman***, 2011 WL 4336602, at *1 (citing *Adams v. Carter Cnty. Mem'l Hosp.*, 548 S.W.2d 307, 308-09 (Tenn. 1977)). "'While a complaint in a tort action need not contain in minute detail the facts that give rise to the claim, *it must contain direct allegations on every material point* necessary to sustain a recovery on any legal theory . . . *or contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial*." ***Webb***, 346 S.W.3d at 427 (quoting *Donaldson v. Donaldson*, 557 S.W.2d 60, 61 (Tenn. 1977)) (alteration in original).

In its brief to this Court, the Med argues that the exclusive causal relationship between Plaintiff's reports and her termination cannot be shown because "her Complaint actually admits that the reason for her termination was her own inappropriate conduct[,]" and "Plaintiff does not and cannot deny this conduct." The Med's contention is simply unfounded. As set forth above, Plaintiff's Complaint acknowledges that the Med's *stated* reason for her termination was her "demonstrated accusatory and confrontational behavior, [and her use of] derogatory and profane language towards members of hospital staff regarding treatment of [her] sister." However, her complaint clearly labels these stated reasons as "pretext and without merit" and it emphatically denies such behavior.

Although we disagree with the Med's assertion that Plaintiff admitted that the incident regarding her sister established a legitimate reason for her termination, we nonetheless find that Plaintiff's complaint fails to properly set forth a claim for relief pursuant to the Tennessee Public Protection Act. As stated above, a plaintiff asserting a claim under the TPPA must establish, among other things, that "the defendant terminated the plaintiff's employment *solely* for the plaintiff's refusal to participate in or remain silent about the illegal activity." ***Webb***, 346 S.W.3d at 437 (citing *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 27 (Tenn. 2011))*; see also Rose v. Cookeville Reg. Med. Ctr. Auth.*, No. M2010-014380COA-R3-CV, 2011 WL 251210, at *5 (Tenn. Ct. App. Jan. 13, 2011) (footnote omitted) ("Because Tenn. Code Ann. § 50-1-304(b) requires that termination be 'solely' for refusing to participate in or remain silent about illegal activities, a claim that a termination violated the Act places a higher burden on a plaintiff than does a claim of common law retaliation"). In her complaint, Plaintiff states only that her "refus[al] to participate in/or remain silent about the illegal act of intentionally failing to provide timely, adequate and/or proper medical attention to patients seeking medical treatment at Defendant's facility [] was a *substantial factor* in the decision that caused Pam Castleman to abruptly terminate [her] shortly thereafter[.]" (emphasis added).[1] As such, Plaintiff's complaint fails to allege one of the essential elements of a TPPA retaliatory discharge claim–that her termination was based *solely* upon refusing to participate in or remain silent about illegal activity. The "threshold for surviving a motion to dismiss for failure to state a claim is generally low, . . . " but "despite the liberal pleading standard set forth in Tennessee Rule of Civil Procedure 8.01

---

[1]We acknowledge that in other parts of her complaint, Plaintiff alleges that she was "terminat[ed] following her refusal to participate in and/or to remain silent about the illegal activity of intentionally failing to provide appropriate, adequate and timely medical treatment to civilians seeking emergency, urgent and medical treatment" and that she was "terminated . . . after she refused to participate in and/or remain silent about the intentional failure to provide appropriate, adequate and timely medical treatment to African-American civilians seeking emergency, urgent and/or medical treatment at the Defendant's facility[.]" However, at no point does she allege an "exclusive causal relationship" between her reports and her termination. ***Franklin***, 210 S.W.3d at 528.

'[t]here is no duty on the part of the court to create a claim that the pleader does not spell out in his complaint.'" ***Steele v. Ritz***, No. W2008-02125-COA-R3-CV, 2009 WL 4825183, at *3-4 (Tenn. Ct. App. Dec. 16, 2009) (quoting *Donaldson*, 557 S.W.2d at 62); *see also Chism v. Mid-South Milling Co. Inc.*, 762 S.W.2d 552, 555 (Tenn. 1988) ("When the Court is dealing simply with allegations of pleadings . . . the Court is not free to construct additional facts or allegations."). We find that the Plaintiff's complaint failed to a state claim for retaliatory discharge pursuant to the Tennessee Public Protection Act, and we are under no duty to create a claim not appropriately set forth.[2] ***See Wilson v. Harris***, 304 S.W.3d 824, 829 (Tenn. Ct. App. 2009) (finding an estoppel claim was properly dismissed where plaintiff failed to allege the element of reliance).

### 2. Common Law Retaliatory Discharge

A claimant alleging common law retaliatory discharge must prove:

(1) that an employment-at-will relationship existed; (2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

***Webb***, 346 S.W.3d at 437-38 (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 800 (Tenn. 2010)).

On appeal, the Med argues that Plaintiff's common law retaliatory discharge claim was properly dismissed because her complaint fails to allege that she was an "at-will" employee, because it fails to "allege[] a single violation of any law, regulation, or statute," and because her own "inappropriate conduct" precipitated her termination. Plaintiff, however, contends that her complaint "lists numerous allegations of discriminatory treatment of African-American patients" which "fully apprised [the Med] of any violations of discrimination laws or statutes" such as "the Equal Protection Clause [of] the [Fourteenth] Amendment to the U.S. Constitution, the Tennessee State Constitution as well as the Tennessee Human Rights Act amongst others." Additionally, she claims that her allegations

---

[2]Because we conclude that Plaintiff's complaint does not otherwise state a cause of action for TPPA retaliatory discharge, we deem pretermitted the issue of whether Plaintiff's complaint sufficiently alleged "illegal activities" as defined by the TPPA.

that "the Med changed medical records and delayed medical treatment to its patients" apprised the Med of alleged Medical Malpractice Act violations.[3]

To support its argument that Plaintiff's complaint is subject to dismissal based upon its failure to specifically reference the "law, regulation, or statute" allegedly violated by the Med, which precipitated Plaintiff's reports, the Med relies primarily upon the case of *Chism v. Mid-South Milling Co., Inc.*, 762 S.W.2d 552 (Tenn. 1988).[4]  In *Chism*, an employee filed a complaint alleging he was the victim of a retaliatory discharge for "insisting [his employer] comply with the provisions of the Internal Revenue Code" and for his "continual policing of the operations of [his employer] in an attempt to bring them within the provisions of said Internal Revenue Code."  *Id.* At 554.  The employee's complaint, however, cited no section of the Internal Revenue Code, nor any state or federal statutory provisions allegedly violated.  *Id.* at 553.

The trial court granted summary judgment to the employer, but the Court of Appeals reversed, finding that the employee had sufficiently stated a cause of action for retaliatory discharge.  ***Chism v. Mid-South Milling Co., Inc.***, Shelby Law No. 53, 1987 WL 30146, at *3 (Tenn. Ct. App. Dec. 29, 1987) *reversed by Chism*, 762 S.W.2d 552 (Tenn. 1988).  The Supreme Court, however, reinstated the trial court's grant of summary judgment and dismissed the case, finding the employee's complaint deficient.  ***See Chism***, 762 S.W.2d at 552.

At the intermediate appellate level, the employee framed the issue as "whether under state law a cause of action for retaliatory discharge arises when an at-will is terminated 'solely for refusing to participate in, continue to participate in, or to remain silent about illegal activities.'"  *Id.* at 553.  The Supreme Court, however, found that the employee had incorrectly stated the issue, noting that

> there are no allegations in the complaint that the employee was ever at any time required or requested to participate in, to continue to participate in or to remain silent about any illegal activities of the employer or its personnel.  The complaint does not allege that plaintiff was terminated for any such reason.

---

[3]The Med contends that Plaintiff did not argue Tennessee State Constitution or Medical Malpractice Act violations in the trial court.

[4]On appeal, Plaintiff claims that the trial court "incorrectly relied upon cases which utilized a Rule 56 summary judgment standard."  Because we are looking to the substantive, rather than procedural, law contained therein, we find this issue without merit.

*Id.* Instead, it found that

> [t]he complaint, construed most favorably to the employee, reflects a disagreement between the employee and the employer about interpretations of various provisions of the Internal Revenue Code, but it at no point contains any allegation that the employee was terminated because he did not participate in or suppress alleged violations, and there is a total absence of any allegation that he was requested or required to remain silent concerning them.

*Id.* at 553. The Court noted that "[i]f the complaint had properly raised the issue relied upon by the Court of Appeals, [it] might be persuaded to reach a different result." *Id.* Additionally, in sustaining the employee's complaint, the Court of Appeals stated:

> Plaintiff has alleged in his complaint that he was discharged for refusing to remain silent about and acquiesce in [employer's] illegal activities. As [employer's] Vice-President/Finance, Secretary and Treasurer, plaintiff could be exposed to criminal liability for [employer's] activities.

*Id.* at 555. The Supreme Court, again, found "difficulty" with this conclusion, noting that the employee's "complaint made no such allegations, nor stated any facts which could reasonably support such a claim." *Id.* at 555. The Court sought "[f]acts more specific and clear" and it noted that "it would have been a simple matter to amend the complaint or to file a specific affidavit if the plaintiff were in fact discharged because he refused to participate in illegal activities, to continue to participate therein or to remain silent about them as stated in his appellate brief." *Id.* at 557.

From the foregoing language, it appears the Supreme Court's grant of summary judgment was based, at least in part, upon the complaint's *factual* deficiencies. However, the Court also noted the failure of the employee's complaint to cite to a specific section of the Internal Revenue Code, or to a state or federal statute allegedly violated. *Id.* at 554. It then cited the following examples of "clearly defined public policies" which warranted retaliatory discharge protection: discharge for refusing to commit perjury, *Petermann v. Int'l Brotherhood of Teamsters*, 344 P.2d 25 (Cal. App. 1959); discharge for insisting upon obeying a lawful subpoena, *Ludwick v. This Minute of Carolina, Inc.*, 337 S.W.2d 213 (S.C. 1985); discharge for insisting upon testifying truthfully, *Sides v. Duke Univ.*, 328 S.E.2d 818 (N.C. App. 1985) *overruled on other grounds by Kurtzman v. Applied Analytical Indus., Inc.*, 493 S.E.2d 420, 422 (N.C. 1997); discharge for honoring a subpoena to jury duty, *Nees v. Hocks*. 536 P.2d 512 (Ore. 1975); discharge for not seeking to be excused from jury duty, *Reuther v. Fowler & Williams, Inc.*. 386 A.2d 119 (Pa. Super. 1978). *Id.* at 556. "The Court [then] emphasized that '[i]n each of these cases, . . . very specific statutory violations were

charged, and usually the employee's personal exposure to civil or criminal sanctions was emphasized.'" ***Sanders v. Henry County***, No. W2008-01832-COA-R3-CV, 2009 WL 1065916, at *5 n.2 (Tenn. Ct. App. Apr. 21, 2009) *perm. app. denied* (Tenn. Oct. 19, 2009) (quoting *Chism*, 762 S.W.2d at 557). Furthermore, it stated that "[i]n order to state a claim for th[e] very exceptional tort action [of retaliatory discharge], the pleader must show [a] clear violation of some well-defined and established public policy." ***Id*** at 555. The Court found a general citation to Internal Revenue Code insufficient, noting that "[o]f course, general public policy demands accurate record keeping and compliance with the tax laws, but the Internal Revenue Code and its attendant regulations are very broad and sweeping in their terms[,] [and t]here can be much legitimate disagreement concerning their application in specific cases." ***Id.*** at 556.

In the instant case, Plaintiff's complaint alleges that she reported the Med's practices of forcing African American patients to endure "unnecessar[il]y long wait times" despite the availability of beds, and of prioritizing white patients ahead of African American patients with more severe injuries. Additionally, she claims that such reports were a "substantial factor" in her termination. However, her complaint cites no "specific public policy embodied in the law[,]" *Guy*, 79 S.W.3d at 538 (citation omitted), nor any statutory or regulatory provision which the Med's actions allegedly violate. This omission is fatal, as "[c]laimants alleging common law retaliatory discharge *must* identify 'an unambiguous constitutional, statutory or regulatory provision' as evidence of the public policy that the employee's discharge violates." ***Gossett***, 320 S.W.3d at 788 (quoting *Chism*, 762 S.W.2d at 556) (emphasis added). "This element sufficiently limits the retaliatory discharge cause of action to only those cases in which a discharge violates public policy." ***Id.*** (citing *Chism*, 762 S.W.2d at 556; *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002)). Plaintiff's allegation of racial discrimination in formulating hospital wait times, without more, does not "identify 'an unambiguous constitutional statutory or regulatory provision'" allegedly violated. ***See Gossett***, 320 S.W.3d at 788 (citation omitted). Accordingly, we find that Plaintiff's complaint fails to sufficiently allege a claim of common law retaliatory discharge.

Moreover, we find that Plaintiff's common law retaliatory discharge claim was insufficient as it stated only that Plaintiff was an "employee"–as opposed to an "employee at will"–of the Med during the time of the events at issue. We acknowledge that "'Tennessee has long adhered to the employment-at-will doctrine in employment relationships not established or formalized by a contract for a definite term.'" ***Hill v. Southwest Tenn. Comm'n Coll.***, No. W2010-01222-COA-R3-CV, 2010 WL 4962895, at *2 (Tenn. Ct. App. Dec. 7, 2010) *perm. app. denied* (Tenn. Apr. 12, 2011) (quoting *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002)). However, the existence or non-existence of

an employment contract is not discussed in Plaintiff's complaint, and we are "not free to construct additional facts or allegations." *Chism*, 762 S.W.2d at 555. Because the existence of an employment-at-will relationship is an essential element of a common law retaliatory discharge claim, *see Webb*, 346 S.W.3d at 437-38, we find that Plaintiff's complaint failed to properly allege such.

### 3.   Leave to Amend

Having affirmed the trial court's conclusions that Plaintiff's complaint failed to sufficiently state claims for statutory and common law retaliatory discharge, we must now consider Plaintiff's argument that the trial court erred in refusing her leave to amend her complaint. "A trial court's decision to deny a motion to amend a complaint is [] reviewed under an abuse of discretion standard." *Watkins v. Affiliated Internists, P.C.*, No. M2008-01205-COA-R3-CV, 2009 WL 5173716, at *13 (Tenn. Ct. App. Dec. 29, 2009) (citing *Merriman v. Smith*, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979)). However, "[t]his discretion is somewhat constrained by Tenn. R. Civ. P. 15(a), which states that leave of the court to amend a pleading 'shall be freely given when justice so requires.'" *Altice v. NATS, Inc.*, No. M2007-00212-COA-R3-CV, 2008 WL 1744571, at *4 (Tenn. Ct. App. Apr. 15, 2008). Factors a court should consider when determining whether to allow an amendment include: "'[u]ndue delay in filing; lack of notice to the opposing party; bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment.'" *Id.* (quoting *Merriman*, 599 S.W.2d at 599).

"A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served[.]" **Tenn. R. Civ. P. 15.01**. "'[A] motion to dismiss is not a responsive pleading, therefore, a plaintiff who seeks to amend his or her complaint prior to the filing of [an] answer by the defendant may do so without leave of court.'" *Moore v. Turney Ctr. Disciplinary Bd.*, No. M2009-01056-COA-R3-CV, 2010 WL 1404444, at * 2 (Tenn. Ct. App. Apr. 7, 2010) (quoting *Mosby v. Colson*, No. W2006-00490-COA-R3-CV, 2006 WL 2354763, at *11 (Tenn. Ct. App. Aug. 14, 2006)). However, where leave is required, "[t]he proper way to request the court for leave to amend under [Tennessee Rule of Civil Procedure 15] is to attach a copy of the proposed amendment to the motion [to amend] so that it becomes part of the record at that time, regardless of what action the trial court takes or fails to take on it." *Jones v. Prof'l Motorcycle Escort Serv.,* 193 S.W.3d 564, 573 (Tenn. 2006) (quoting *Taylor v. Nasvhille Banner Publ'g Co.*, 573 S.W.2d 476, 484 (Tenn. Ct. App. 1978)) (footnote omitted).

The procedural posture of this case is curious. Plaintiff acknowledges in her brief to this Court that leave to amend was not required because the Med had filed only a motion to dismiss in this case. However, in her response to the Med's motion to dismiss she sought a limited amendment to her complaint,[5] she orally sought leave to amend at the hearing on the Med's motion to dismiss,[6] and on appeal, she argues that the trial court erred in "not allowing [her] an opportunity to amend her complaint."

From the record and the parties' briefs, it is apparent that the trial court dismissed Plaintiff's complaint without allowing her leave to amend. However, from the record, we cannot discern whether her inability to amend was the result of the trial court's refusal to consider her requests to amend, or whether it considered her requests and denied such. Even if her requests were considered and denied, the reasons for the denials are not apparent in the record. Our Supreme Court stated in *Henderson v. Bush Bros. & Co.*, 868 S.W.2d 236, 238 (Tenn. 1993), that "in the event [a] motion to amend is denied, the trial court must give a reasoned explanation for his action." Without this information, this Court cannot discern the reasons behind the trial court's denials, if made, in order to determine whether such constituted an abuse of discretion. Based upon the lack of information in the record, we are obliged to vacate the dismissal of Plaintiff's complaint and to remand for consideration of the amendment requests and for express findings.

---

[5]In its motion to dismiss, the Med alleged numerous reasons why Plaintiff's complaint failed to state a claim. One of which was Plaintiff's failure to allege that she had a fear of termination contemporaneous with her decision to report illegal activities, which Defendant claimed was an element of a TPPA claim that must be specifically alleged in a complaint. In her response to Defendant's motion to dismiss, Plaintiff argued that a "contemporaneous fear" need not be alleged in a complaint; alternatively, she requested that she be given "an opportunity to amend the Complaint to specifically insert the word 'fear' into her allegations."

[6]At the hearing, Plaintiff requested to "amend the petition to state those specific statutes . . . or to state using specific terms sole cause of her termination."

## IV.  CONCLUSION

For the aforementioned reasons, we vacate the dismissal of Plaintiff's complaint and remand for consideration of her requests to amend and for express findings.  Costs of this appeal are taxed to Appellant, Christie Quinn-Glover, and her surety, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.